**[J-35A-2023 and J-35B-2023] [MO: Donohue, J.]**
**IN THE SUPREME COURT OF PENNSYLVANIA**
**WESTERN DISTRICT**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | : | No. 32 WAP 2022 |
| | : | |
| Appellant | : | Appeal from the Order of the |
| | : | Superior Court entered October 8, |
| | : | 2021, at No. 348 WDA 2020, |
| v. | : | reversing the Order of the Court of |
| | : | Common Pleas of Washington |
| | : | County entered February 10, 2020, |
| JESSICA RIZOR, | : | at No. CP-63-CR-0002637-2004, |
| | : | vacating the Judgment of Sentence |
| Appellee | : | entered June 5, 2008, and |
| | : | remanding. |
| | : | |
| | : | SUBMITTED:  April 4, 2023 |
| | | |
| COMMONWEALTH OF PENNSYLVANIA, | : | No. 33 WAP 2022 |
| | : | |
| Appellee | : | Appeal from the Order of the |
| | : | Superior Court entered October 8, |
| | : | 2021, at No. 348 WDA 2020, |
| v. | : | reversing the Order of the Court of |
| | : | Common Pleas of Washington |
| | : | County entered February 10, 2020, |
| JESSICA RIZOR, | : | at No. CP-63-CR-0002637-2004, |
| | : | vacating the Judgment of Sentence |
| Appellant | : | entered June 8, 2008, and |
| | : | remanding. |
| | : | |
| | : | SUBMITTED:  April 4, 2023 |

# DISSENTING OPINION

**JUSTICE WECHT**                                                            **DECIDED: NOVEMBER 22, 2023**

This is a strange case.  The interesting question here was one of remedy—whether

counsel's ineffectiveness in advising a criminal defendant to reject a plea offer requires

specific performance of that rejected plea offer, rather than merely a grant of a new trial.[1] Because the Majority concludes that Jessica Rizor is entitled to no remedy at all for her counsel's deficient advice, the nature of that remedy is now immaterial. We are left with an exercise in error correction of an intermediate court's nonprecedential decision on a unique and highly specific set of facts, which is not a matter that generally satisfies this Court's review standards under the Rules of Appellate Procedure.[2] Fortunately, the unusual facts of this case make it unlikely to be of much precedential value.

Setting aside prudential concerns, the Majority's analysis is unconvincing. In broad strokes, the facts of this case established a callous infanticide, of which the Commonwealth's evidence was strong. The extensive evidence demonstrating that Rizor killed her newborn baby and disposed of the child in a garbage bag was not likely to win her much sympathy among jurors, to say the least. The Commonwealth offered her an objectively favorable plea deal, with a minimum sentence well below anything that she could have hoped to receive pursuing her counsel's questionable mental health theories. Yet, she rejected this offer on her counsel's advice, based upon his wildly unprofessional guarantees that he would assure her acquittal and that she would "never set foot on state [prison] grounds."[3]

The Majority concludes that Rizor failed to demonstrate prejudice—that the result would have been different but for her counsel's ineffectiveness. This, according to the

---

[1] The suggestion that the remedy for such ineffectiveness is acceptance of the original, rejected plea offer derives from the Supreme Court of the United States' decision in *Lafler v. Cooper*, 566 U.S. 156 (2012), and our Superior Court's decision in *Commonwealth v. Steckley*, 128 A.3d 826 (Pa. Super. 2012). This is a question of first impression in this Court. I note, however, that I authored the opinion in *Steckley* while serving as a Judge on the Superior Court.

[2] *See* Pa.R.A.P. 1114.

[3] Notes of Testimony, PCRA Hearing, 6/8/2018 ("N.T. PCRA"), at 37.

Majority, is because Rizor purportedly did not testify that, but for her counsel's constitutionally deficient advice, she would have accepted the Commonwealth's plea offer. The Majority bases this conclusion upon a hyper-literal reading of several conditional statements that Rizor made at the evidentiary hearing: that she told her counsel that she wished to proceed to trial "if there was a chance" of winning, and that she would have accepted the plea offer if she "had no chance" at trial.[4] The Majority strips these statements of their context and concludes that Rizor's testimony meant that she would have accepted the plea offer only if there was literally a zero percent chance of acquittal. But Rizor admitted on cross-examination that there "is always that chance" of acquittal.[5]

Reading these isolated statements in their strictest sense leads to an absurdity. The Majority concludes that Rizor's testimony meant that "she would only take a plea offer if there was no chance of acquittal," even though there is always a chance of acquittal.[6] Translation: there was no circumstance in which Rizor would have accepted the plea. Thus, her PCRA petition alleging that her counsel provided ineffective assistance with regard to the plea offer was, seemingly, a pointless exercise.

Rizor presumably did not litigate this PCRA petition merely to amuse herself. One would assume that she sought meaningful post-conviction relief, rather than merely seeking to prove a point that her counsel was ineffective in the abstract, in a way that did not matter to anything. But if the Majority's reading of her testimony is correct, then one is left to wonder why Rizor would even bother. The Majority seems to acknowledge the absurdity of its reading, given that it states that it feels "constrained" to adopt it by the

---

[4]     Maj. Op. at 39; N.T. PCRA at 38, 42.

[5]     Maj. Op. at 39; N.T. PCRA at 54.

[6]     Maj. Op. at 39.

standard of review.[7]  But, from my perspective, viewing the evidence in the light most favorable to the Commonwealth does not require us to read Rizor's testimony as nonsense when there is another, more sensible understanding of what she said.

In context, Rizor did not testify that she rejected the plea offer based upon her independent assessment of her "chance" at trial.  She testified that her counsel, Attorney Robert Brady, advised her to reject the offer:

> [Rizor's Counsel]:  Can you take us through what plea offers, if any, there were, how long they were and what your discussions were with Mr. Brady about them?
>
> [Rizor]:  The first plea offer, I believe, was seven to thirty years.  Whenever that was brought to me, Mr. Brady told me it was a ridiculous offer and I should not take it.  Later, there was a second plea offer of five and a half to thirty and he told me that I would never set foot on state grounds. . . .  That he didn't believe I should take that.[8]

Rizor was facing the significant possibility of a conviction for first-degree murder and a sentence of life imprisonment without the possibility of parole (which is, of course, what actually happened).  Yet, Attorney Brady advised Rizor that an offer of seven to thirty years was "ridiculous" and that she should reject the even more favorable offer of five-and-one-half to thirty years based upon an unsupportable guarantee of acquittal, or maybe a conviction of a lesser crime.  As the Commonwealth asked her on cross-examination:

> [Commonwealth]:  You wanted to take the chance on Mr. Brady's skills at trial to get that lesser sentence, to get no more than five and a half years apparently; correct?
>
> [Rizor]:  Because he told me that that's what he could do.
>
> [Commonwealth]:  He was convinced he could win it; correct?

---

[7]     *Id.*

[8]     N.T. PCRA at 37.

[Rizor]: Yes.[9]

Attorney Brady's confidence was grounded in a purported mental health defense. He believed that he could establish that, at the time that Rizor killed her baby, she was suffering from a mental condition that would support a diminished capacity defense, and that perhaps could reduce murder to voluntary or involuntary manslaughter. Although the trial court ultimately precluded Rizor's mental health evidence because it failed to establish the requisites of any viable defense, the trial court had not made this ruling at the time that Rizor rejected the Commonwealth's plea offer. The Majority makes much of this fact. It asserts that "Rizor had a colorable defense" when she rejected the plea offer, and the subsequent preclusion of that defense, thus, could not have impacted her earlier decision.[10] The Majority's timeline is accurate, but it overlooks what the effect of the defense would have been, even if the trial court had not precluded it and the jury somehow accepted it.

As the Majority develops, even if Attorney Brady could have proven a diminished capacity defense, this would only reduce first-degree murder to third-degree murder.[11] Third-degree murder carries a maximum sentence of forty years' imprisonment.[12] It is doubtful whether Attorney Brady fully understood the likely result of the defense that he proffered. His explanations for why the trial court should admit his proposed mental health evidence were scattershot:

> The Court: What is the challenge to the murder charge? It's not an insanity defense.

---

[9]    N.T. PCRA at 55.

[10]   Maj. Op. at 39.

[11]   *See id.* at 4 n.7; *Commonwealth v. Hutchinson*, 25 A.3d 277, 312 (Pa. 2011).

[12]   18 Pa.C.S. § 1102(d).

Mr. Brady: Certainly there is an element of an insanity defense. When we deal with diminished capacity we're dealing with an insanity charge and there is an element of it and you can't forego it. However, [Rizor] claims she's not guilty by reason of insanity. We do not have that standard; we do not have a medical doctor who made that statement. To negate diminished capacity as a result of mental illness—I'm sure we're going to argue and get into that as far as how I'm going to defend this. I have a lot of ideas, Judge, and I'm going to respond to the evidence as the evidence is submitted through the government's case in chief.[13]

Attorney Brady seemed to suggest that he was offering an insanity defense, yet acknowledged that he had no evidence to support it. He further suggested diminished capacity, but did not make clear how he planned to establish that defense either. He had "a lot of ideas," which he suggested he might flesh out "as the evidence is submitted through the government's case in chief"—*i.e.*, he would figure it out as he went, during the trial itself. The Commonwealth was quick to point out that the medical testimony that Attorney Brady had proffered failed to establish an essential element of diminished capacity—that Rizor's alleged mental condition prevented her from forming a specific intent to kill:

[Commonwealth]: I don't know where we are at because we have never received a written notice of an insanity defense. None of their reports meets the *M'Naghten* standard.[14] None of their reports meet the standard of guilty but mentally ill, which is only available when there is an insanity defense at trial. A diminished capacity defense is an extremely limited defense. It does not take third degree to voluntary manslaughter. It takes first degree murder to third degree murder and it requires extensive psychiatric testimony establishing a defendant suffered from one or more mental disorders which prevented him or her from formulating the specific intent to kill. We do not

---

[13]     Notes of Testimony, Trial, 3/3/2008 ("N.T. Trial"), at 21-22.

[14]     The *M'Naghten* test is the classic common-law standard for establishing "insanity" as a defense to criminal prosecution, and it is codified in Pennsylvania law. *See* 18 Pa.C.S. § 315(b) ("[T]he phrase 'legally insane' means that, at the time of the commission of the offense, the actor was laboring under such a defect of reason, from disease of the mind, as not to know the nature and quality of the act he was doing or, if the actor did know the quality of the act, that he did not know that what he was doing was wrong.").

have a single psychiatric report purporting to provide that opinion in this case.[15]

Attorney Brady responded, again conceding that he could not satisfy the legal definition of insanity, but suggesting that his purported diminished capacity defense could possibly lead to a conviction of voluntary or involuntary manslaughter, rather than murder:

> Mr. Brady: The Commonwealth is suggesting that we are not allowed as the defense to introduce evidence of a mental infirmity which would impact on [Rizor's] ability to perceive events in a manner in which she can respond to events because we do not have an expert who can reach or would state that she reaches the standard under *M'Naghten*. I think the suggestion [the Commonwealth] has just made [that] a diminished capacity defense or any mental infirmity defense as to that person's state of mind and ability to perceive events and response in formulating a specific intent that would be necessary for a conviction even under a voluntary manslaughter can only be done in the event I have a doctor who is willing to come in and say that they have not reached the *M'Naghten* Rule for insanity, but the jury decides not to accept it. That, I disagree with.[16]

Attorney Brady further explained his belief that his purported diminished capacity defense could support a manslaughter conviction:

> Mr. Brady: It's a state of mind that would compel one to be able to formulate malice. It would be a state of mind that could negate a premeditation, which the accusation is. It is a state of mind that would have to be given to the jury for them to be able to appraise either a gross negligence or recklessness standard in order to find or not find involuntary manslaughter or voluntary manslaughter as a defense as well as under *M'Naghten* if we have evidence to that effect. If I have evidence from a doctor stating that she could not formulate an intent to kill because of her mental illness, if I had the *M'Naghten* rule, I would certainly have it here.[17]

---

[15]    N.T. Trial at 23.

[16]    *Id.* at 24-25.

[17]    *Id.* at 28.

The trial court asked Attorney Brady to clarify his position, being unaware of any precedent suggesting that a diminished capacity defense can reduce a murder charge to manslaughter rather than third-degree murder:

> The Court:   Is there case law that says state of mind takes you to manslaughter other than provocation or heat of passion?[18]

Attorney Brady cited no such case law, but instead reiterated his position that evidence of Rizor's mental health was relevant to establishing the *mens rea* for a manslaughter conviction:

> Mr. Brady:   It is the provocation and heat of passion.  I'm certainly not suggesting that the baby provoked her into this.  That standard is quite separate.  Just look at your charge.  What you see right after that it's talking about provocation and then it's going into heat of passion.  In heat of passion it's the Defendant's perception of the stimuli at the time of the event and how she would respond.  We are asking the jury to examine her mind, not the reasonable mind standard.  For that we can introduce our testimony and our evidence from our physicians as to what her state of mind would or could be based on this mental illness that she does in fact have.[19]

Attorney Brady's theory was difficult to follow.  What is clear is that he believed that his proffered evidence would establish diminished capacity, and that could lead the jury to find Rizor guilty of voluntary or involuntary manslaughter rather than first-degree murder.  But there were multiple problems with this theory from the beginning.  As the Commonwealth stressed, the reports that Attorney Brady produced from his proposed medical experts did not even include an averment that Rizor's alleged mental condition precluded her from forming a specific intent to kill—an essential element of a diminished capacity defense.  Furthermore, and more importantly, Attorney Brady seemed either not

---

[18]   *Id.* at 29.

[19]   *Id.*

to understand—or he refused to concede—that a diminished capacity defense reduces first-degree murder to third-degree murder, not manslaughter.

Attorney Brady's mental health defense was flimsy from the outset. And even if established, that defense would have put his client in prison for upwards of forty years. If Attorney Brady had properly understood this, it would have been remarkably foolish to advise Rizor to reject the highly favorable plea offer of five-and-one-half to thirty years' imprisonment. One could argue that there was still an outside chance that the jury could have returned a voluntary or involuntary manslaughter conviction, but Attorney Brady's asserted diminished capacity defense would not have achieved that result, and relying upon the jury to reach that outcome anyway was a gamble on extremely long odds. Regardless, involuntary and voluntary manslaughter convictions carry maximum prison terms of ten and twenty years, respectively.[20] Although the plea offer at issue had a longer maximum term, it is hard to imagine that Rizor would have received a much more favorable minimum term, even in the highly unlikely scenario that she was convicted of manslaughter rather than murder. In any event, the sentences that those convictions carry in no way warranted Attorney Brady's assurances to Rizor that she would "never set foot" in state prison or the like. It appears that Attorney Brady simply did not understand the legal consequences of his position. Whatever merit that he saw in the supposed diminished capacity defense, he should have known that, even if the jury accepted it, his defense strategy was exceedingly unlikely to result in an acquittal, or even

---

[20]    *See* Maj. Op. at 4 n.8; 18 Pa.C.S. §§ 2503(c), 2504(b), 1103(1)-(2). Although involuntary manslaughter is generally a first-degree misdemeanor, where, as here, the victim is under twelve years old and in the care, custody, or control of the defendant, the crime is classified as a second-degree felony. 18 Pa.C.S. § 2504(b).

conviction of any lesser charge that would result in a sentence more favorable than that contained in the plea offer.[21]

We do not have testimony about what Attorney Brady was thinking, for another reason that makes this case strange. At evidentiary hearings concerning counsel's ineffectiveness, the court ordinarily hears testimony from counsel, who explains his or her rationale for the decisions that the petitioner is challenging. Attorney Brady was not present for these proceedings. Evidently, Rizor's was one of the last cases that he accepted before retiring from the practice of law and leaving the country. Although he

---

[21] For this reason, I do not share the Majority's view that the PCRA court's credibility determination is fatal to Rizor's claim. *See* Maj. Op. at 40-41. The PCRA court focused upon the potential availability of Rizor's mental health defenses at the time that she rejected the plea, and thus "did not find credible [Rizor's] claims that she was uninformed at the time she rejected the plea offer, that she did not know that her mental [health] experts would not be permitted to testify, and that she would not have rejected the Commonwealth's plea offer had she known the defense mental health experts would not be permitted to testify." PCRA Ct. Op., 6/29/2020, at 30. In my view, even if the defense experts had been permitted to testify, Attorney Brady's earlier advice to reject the plea offer was still deficient due to his apparent misunderstanding of the legal effect of a diminished capacity defense. Furthermore, I note that the PCRA court stressed that, once it became clear that her "defense" would be unavailable, Rizor apparently "expressed no desire to revisit the plea offer or to inquire whether the plea offer was still available." *Id.* at 31. In fact, Rizor testified on cross-examination:

> [Commonwealth]: You're telling us the only reason you went to trial was because [Attorney Brady] told you he thought he could beat it.
>
> [Rizor]: Yes.
>
> [Commonwealth]: And then you learned at some point shortly thereafter, according to you, that the mental health evidence wasn't going to come in?
>
> [Rizor]: Correct.
>
> [Commonwealth]: And your thoughts were that that isn't going to help your case; correct?
>
> [Rizor]: Right.
>
> [Commonwealth]: *At that point, did you try to negotiate a plea at all?*
>
> [Rizor]: *Mr. Brady told me that wasn't possible.*

N.T. PCRA at 62 (emphasis added).

had spoken to one of Rizor's post-conviction attorneys, and had allegedly conceded his ineffectiveness in Rizor's case, he ultimately told Rizor's current counsel that he would not testify at an evidentiary hearing and that he did not wish to communicate further about the matter, citing his own mental health concerns.[22] Rizor's current counsel sought to have Attorney Brady declared "unavailable" and thus to introduce hearsay evidence of Attorney Brady's statements about his deficient performance, but the PCRA court declined the request. Thus, we are left to wonder how Attorney Brady could possibly have believed that his advice to Rizor was prudent.

I cannot agree with the Majority that, at the time that Rizor rejected the Commonwealth's plea offer, she had a "colorable defense," that she therefore reached a reasoned conclusion that she had a sufficient "chance" of acquittal, and—because even the slimmest chance apparently would do—that there was no circumstance in which she would have accepted this fantastic plea offer.[23] As I read her testimony, Rizor rejected the plea offer because Attorney Brady told her to. And he advised her in this manner

---

[22] Refusing to cooperate with the efforts of Rizor's current counsel to procure his testimony, Attorney Brady sent counsel a Facebook message stating:

> I wish you good luck in your endeavors, unfortunately I doubt I will be able to assist you. There is a reason that I retired. I am now totally and permanently disabled. Mine is a mental disability. I have almost no short term memory. When I retired I was afraid it was dementia. It's not but nonetheless I have very little recollection.

> I am not willing to put myself in a position where my very competency to testify would be at issue. I hope you understand. It is one of the main reasons I moved away. Honestly Josh I don't believe I can help you, I simply don't remember.

> Good luck.

See Rizor's Omnibus Pre-Hearing Motion, 10/19/2017, Exhibit A; Reproduced Record at 883a.

[23] Maj. Op. at 39.

based upon bravado and an apparent misunderstanding of his own defense strategy and its possible outcomes. Had Attorney Brady given Rizor competent advice based upon a realistic assessment of the circumstances and the likely results, there is every reason to believe that Rizor would have accepted the plea offer.[24] There was no reason for her to litigate this claim otherwise.

If Rizor's claim must fail because she did not utter the magic words that would allow her to cross the finish line, then it is likely that she was let down not only by Attorney Brady, but also by her post-conviction counsel.[25] Perhaps that is one lesson that gives today's decision some value. Counsel, take heed: this Court will read your client's testimony narrowly to the point of absurdity, so ensure that your demonstration of prejudice is so unmistakable that no one could possibly read the transcript otherwise.

Jessica Rizor is in prison for the rest of her life when she could already be on parole right now if her attorney had given her informed and competent advice. I cannot agree that this is effective assistance of counsel.

I respectfully dissent.

---

[24] The Majority denies Rizor relief because she purportedly presented "no specific evidence that she would have taken the deal." Maj. Op. at 42. Yet, it acknowledges that the assessment of prejudice "does not necessarily require the testimony of a PCRA petitioner, or any direct testimony," and it "may be that circumstantial evidence proves that there is a reasonable probability that the petitioner would have accepted the plea deal but for counsel's deficient advice." *Id.* Despite this caveat, it appears that the Majority would require precisely the "direct testimony" that it says it not required.

[25] Indeed, one of the instances in which Rizor explained her decision in terms of her "chance" at trial—a word upon which the Majority places great weight—was simply her repetition of the phrasing that her counsel used when asking her the question:

> [Rizor's Counsel]: Now, if Mr. Brady had told you, we have *no chance of winning*, how would that have affected your decision?
>
> [Rizor]: If I had no chance, I would have taken the plea offer.

N.T. PCRA at 42 (emphasis added).